286 P.2d 785

STATE of Utah, by and through its Engineering Commission, Plaintiff and Respondent,

v.

Fred TEDESCO et al., Defendants,

and

Bird & Evans, Inc., Counter-claimants and Appellants.

No. 8270.

Supreme Court of Utah.

Aug. 5, 1955.

Pugsley, Hayes & Rampton, Salt Lake City, for appellant.

Robert B. Porter, Atty. Gen., Salt Lake City, for respondent.

HENRIOD, Justice.

This is an appeal from a judgment notwithstanding a verdict for plaintiff, in a condemnation suit in which defendant's adjoining land allegedly was injured thereby. Affirmed, with costs to plaintiff.

Defendant, Bird & Evans, Inc., is the owner of land adjoining that of the Wagener Improvement Co., whose land was the subject of condemnation. In the role of party defendant, Bird & Evans filed a claim in the condemnation proceedings, describing its land which adjoined that sought to be condemned, alleging that its land would suffer damage if the Wagener land was condemned. We have doubts as to whether such pleading can be interpreted to constitute a claim of *interest in the land sought to be condemned,* as is required before one may intervene in a condemnation action such as this and under the facts of this case,[1] but for the purpose of this decision it will be treated as such a pleaded claim.

So far as is important to the decision of this case, the State claims sovereign immunity from defendant's alleged claim, and asserts that the facts do not justify any conclusion to the effect that defendant, Bird & Evans had any compensable interest in the Wagener land. We shall treat these contentions in reverse order.

The defendant can prevail here only if the facts clearly establish that it has a present, direct and real interest in the land sought to be condemned by the State, and the defendant concedes that this is so. The only evidence in the record that might reflect such an interest, is the testimony of one witness, Mr. Brayton, a lawyer and the vice-president of the Wagener company. It may be abstracted as follows:

1. Title 78-34-7, Utah Code Annotated 1953.

That generally he was acquainted with what is known as Oak Hills Subdivision, a planned residential area. That "easterly of the (Wagener tract) is a 35 acre tract, which is the subject of your suit here, and which is so closely located with respect to the (Wagener tract) that we wished to include it and, by the agreement with the owners, did include in the Oak Hills development." "I had the general job, I guess, of general manager and handling all business and legal details for that (Wagener) corporation." "I was authorized by the Wagener company to enter into contracts and so forth, in relation to this property in Oak Hills Subdivision." "I was authorized by the owners of the Bird & Evans property, as their attorney, to proceed with planning and development and to enter into contracts." A. B. Paulson was a city planner and architect and the Wagener company engaged him as the overall planner of this subdivision.

In the planned improvement of the overall area, Wagener company and Bird & Evans each would pay the costs and charges incident to its own property. "That is to say Wagener would take care of all of the expenses incident to its much larger area and then Bird & Evans woud take care of the expenses incident to its area and did so, *so far as I know.*" Brayton went so far as to draft and prepare restricted covenants for the Oak Hill Subdivision. "But

I must explain that in an area so large as that it was impossible and it would have been bad business to plat it all overall at once and the plan was to bring in a subdivision from time to time as the sales and conditions generally warranted, so that while we have the restrictive covenants they apply only to one small area and the northern part of the area known as Oak Hills Plat A. Now Oak Hills Plat B was another one that was planned and would have come in later on and, in due course, I suppose, your Bird and Evans subdivision would have come in."

A master plan had been prepared by Paulson about '45 or '46 which included both the Wagener and the Bird & Evans property. In 1948 a survey of the whole property was made by a Mr. Heath which included both properties. "I was employed, along with Mr. Paulson, jointly, by the Bird & Evans tract and the Wagener people to draw up restrictive covenants to apply to the whole area." We drew them up. Mr. Brayton then testified that those restrictive covenants which had been shown him and which were introduced into evidence over objection, were generally the same as were to be applied to the other tracts as the plats were filed. He said they applied "particularly to the Bird & Evans tract because it was the same high quality of land as was included in Oak Hills Plat A, the restric-

tive covenants introduced into evidence, however, being applicable only to Oak Hills Plat A. He added that "of course, there are planned areas for commercial and schools, and all that sort of thing. The covenants were not the same as to every foot of land in the whole area." At the time the restrictive covenants were drawn "I think that Mr. Bird and Mr. Evans were representing the Bird & Evans property" and the restrictive covenants generally were discussed with those gentlemen "to some extent." They were also discussed with the officers of the Wagener company, which discussions would take place as follows: "Oh, Mr. Paulson and I were back in Moline several times during the period and they were out here on occasions. We would hold meetings sometimes, directors meetings sometimes here and sometimes at Moline and then we would talk on the phone sometimes at Moline so that it was well understood by all the parties connected with the Wagener company that we would have this arrangement with the owners of the (Bird & Evans) property,—that is the way I think of it —and that we would carry on the covenants and restrictions in the same as we would for this larger tract of the Wagener company with them. That arrangement was originally made with Mr. Webb" before Bird & Evans.

"The cost of improvements, of bringing in utilities and anything else in respect to the actual construction work of the subdivision was to be borne by the abutting property, and that meant that the Wagener company would bear the cost of such improvements within its area and Bird & Evans would bear its part within its area." On being asked when the plans called for his company to cross the canyon and come through the plats on the south side, Mr. Brayton stated: "Oh, Mr. Rampton, I can't tell you that. It would depend on how soon we sold out Plat A and how soon it was feasible to set up a plan on the south side," and being asked if they were going to proceed through the entire subdivision as rapidly as the lots could be sold, he stated: "Yes. And as business conditions warranted", which "I think might have ripened so that the abutting ground on Kennedy Drive would have been platted and sold in 1951. Now that is only a guess, in a way." No lots on the contemplated new subdivision in Wagener's southside property had been sold and no plat had been filed, although "we could probably have filed this plat and begun to sell lots during 1951."

On being asked if he knew when Bird & Evans acquired its tract, Mr. Brayton said: "Well, that is just my recollection, too, and I think that was about May of 1948," and on being asked if he knew who was the President of Bird & Evans at that time, he replied: "No, I do not." Further, upon being

asked who authorized him to conduct the negotiations on behalf of the corporation, he answered: "You mean in the planning and that sort of thing?", "Well, I talked to both Mr. Bird and Mr. Evans, also with Mr. Paulson, who was planning engineer, as I was managing the Wagener Improvement Company property."

On this evidence, defendant wishes this court to decide that there were restrictive covenants created which were charges against all of the land of the Wagener company and all of the land of Bird & Evans, giving the latter company a vested interest in the Wagener property, requiring that the State, in condemnation proceedings against the Wagener land must recognize such an interest in the Wagener land for which compensation must be paid to Bird & Evans.

█ We are convinced that the evidence in this case falls far short of creating a vested interest in the Wagener fee in favor of Bird & Evans or vice versa. At best, the only effective charge against any of the land was created by the filing of written restrictive covenants pertaining only to a small area belonging to Wagener company, —not to Bird & Evans,—and such restrictive covenants were binding only as to their signatories, i. e., as to Wagener and the purchasers from Wagener. There is nothing in the restrictive covenants mentioned, which were introduced as an exhibit, that has any reference to Bird & Evans or its property, nor were such restrictive cove-

nants signed by Bird & Evans. Admittedly, Plat A, a small area in the whole tract, and upon which restrictive covenants were placed, was the only plat that had been approved and filed for record. No other plats, including any drawn by Bird & Evans, had been approved and recorded, nor is there any evidence to indicate that any of those proposed would or could comply with statutory requirements,[2] and there is no indication that the authorities having power so to do, would approve such subdivisions if and when they were presented for that purpose. How there could be created a binding charge against Wagener's land in favor of Bird & Evans, or vice versa, without any binding writing signed by either party, without written restrictive covenants having been signed by either party, without any official approval of proposed plats which are required to be approved by statute, and without even any substantial oral manifestations of mutual assent that would justify the conclusion that an estate in real property had been created, is difficult to determine.

█ We believe and hold that to graft charges onto and create interests in real property, which is the subject of condemnation, there must be clear and convincing evidence establishing such charge or interest, and that the evidence in this case falls far short of that quality of proof, as the trial court concluded.

█ Although we need not pass upon the matter, assuming, for the sake of argument, that there may have been a binding parol contract of some sort, at best it would

2. Title 57–5, Utah Code Annotated 1953.

have been a contract for the development of the area and by no means one creating restrictive covenants. Such conclusion is made obvious when it is pointed out that any purchaser from Bird & Evans could not enforce the restrictive covenants filed in connection with Oak Hills Plat A, because Bird & Evans was not a party to those covenants and those covenants did not mention Bird & Evans or its property. To say that a purchaser from Bird & Evans could enforce the Oak Hills Plat A restrictive covenants against a Wagener purchaser because Wagener and Bird & Evans had a parol agreement to put restrictive covenants on lands other than that in Oak Hills Plat, when and if more land might be subdivided and platted, which parol agreement, so far as this record is concerned, may or may not have been known to the residents of Oak Hills Plat A, is to indulge in impractical and unreasonable circuity of reasoning. The contract here, if it could be said there was one, is one looking to the appreciation of land values by mutual carrying out the terms of the contract, if and when those terms were carried out. The power of eminent domain is not exercisable only on condition that values beyond those of the land and any vested interests therein must be paid. The land itself is compensable, as are vested interests such as leaseholds having a fair rental value, life estates and the like, and we choose to adhere to the sensible doctrine, best expressed in 2 Nichols, Eminent Domain, 3rd Ed., Sec. 5.76(2), p. 115, where it is said:

"The mere fact that a business has assumed the form of existing profitable contracts with respect to the use of the land does not, under ordinary circumstances, warrant the award of damages in excess of the value of the land. The strongest examples of such contracts are leases of the premises or agreements to lease the same to solvent tenants at a greater rent than the present fair rental value of the premises, and contracts to sell the produce of the soil at a profitable price. The taking of the land terminates all contracts in respect to its use and the owner is under no liability for his failure to carry out such agreements, but it is well settled that he is not entitled to compensation for the loss of his contracts. No distinction has been drawn between a damage to business caused by making impossible the performance of existing contracts and a damage consisting of the loss of expected contracts. If an owner of land taken by eminent domain is not entitled to compensation for the loss of profits on his contracts, existing and expected, taken as a whole—that is, injury to his business—a fortiori he is not entitled to compensation for the loss of expected profits on a single contract.

"It is true that the constitution of the U. S. prohibits a state from enacting any law impairing the obligation of contracts, but a statute authorizing the

38

taking of land with respect to the use of which a valid contract is in existence is not obnoxious to this provision, even if no compensation is awarded for the annulment of the contract, since all contracts for the use of land are entered into in view of the possible taking of the land for public use, and the sovereign power of eminent domain cannot be impaired by contracts of private parties. It is only when 'property' is created by contract, as in the case of a franchise or a lease, that the protection of the constitution can be invoked."

■■■ Since we hold that at best the defendant may have had a contract right in the development of prospective residential land, which, if carried out, would have enhanced the value of its land, such a claim cannot be made the basis for intervention in a condemnation suit brought by the state against property in which defendant has no vested interest. This being so, the defendant could not sue the sovereign for the damages claimed here, and the State's defense of sovereign immunity is well taken in this case. Any claim defendant may deem it has because of damage growing out of the condemnation which is not assertable because of such sovereign immunity, more properly may be asserted by application to the Board of Examiners under the provisions of Titles 63–6–11 and 63–6–13, U.C.A. 1953, for hearing and decision as to the merit of such claim.

McDONOUGH, C. J., and CROCKETT, J., concur.

WADE, Justice (concurring in the result).

I concur in the result on the ground that appellants failed to show that they have suffered any compensable damages to their property. However, I do not agree that if such damages had been shown the defense of sovereign immunity is applicable to this case.

WORTHEN, Justice, concurs in the opinion of WADE, J.